**NATIONAL MARITIME UNION OF AMERICA, AFL–CIO, Petitioner–Appellant,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent–Appellee,**

**SCNO Barge Lines, Inc., Intervenor.**

No. 142, Docket 88–4058.

United States Court of Appeals, Second Circuit.

Argued Sept. 19, 1988.

Decided Feb. 8, 1989.

David M. Silberman, Washington, D.C. (Laurence Gold, John Rothschild, Washington, D.C., Sidney Kalban, New York City, of counsel), for petitioner-appellant.

Robert F. Mace, Atty., N.L.R.B., Washington, D.C. (Collis S. Stocking, Supervisory Atty., Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for respondent-appellee.

Vance D. Miller, St. Louis, Mo. (James M. Talent, Lashly, Baer and Hamel, P.C., St. Louis, Mo., of counsel), for intervenor.

Before PIERCE and WINTER, Circuit Judges, and STEWART, District Judge.[*]

* Hon. Charles E. Stewart, Jr., Senior Judge, United States District Court for the Southern District of New York, sitting by designation.

PIERCE, Circuit Judge:

The National Maritime Union of America, AFL–CIO ("the Union") petitions for review of an order of the National Labor Relations Board ("the Board") which dismissed a complaint charging that intervenor SCNO Barge Lines, Inc. ("the Company" or "SCNO") violated § 8(a)(1) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. § 158(a)(1) (1982), by denying the Union's organizers access to the employees on the Company's boats.

We conclude that, except for home visits, the alternative means the Union had available to communicate with the Company's employees, namely, by mail, by telephone or by meetings at a Union office, were unreasonable. As for home visits, we agree with the Board's conclusion that the General Counsel failed to meet her burden of proving that they were an unreasonable alternative means of communication. Hence, we deny the petition.

## BACKGROUND

In 1979, the Company operated towboats on the Mississippi River and other major rivers in the midwest. These boats, each with a crew of about ten, rarely tied up along the river bank. Supplies were delivered midstream. Besides crew members, only people with business aboard the boats, such as supply vendors, repair workers, and marine surveyors, routinely boarded the boats.

Crew members typically remained aboard for thirty days at a time, followed by thirty days off. The homes of the Company's seventy-five non-supervisory employees were dispersed over twelve states. Thirty-two of these crew members lived within fifty miles of a sizeable city located along one of the rivers on which the boats operated. Many of the rest lived in rural areas and had no street addresses.

In April 1979, the Union decided to initiate an organizing drive among towboat crews. On July 25, 1979, the organizer in charge of the drive, Henry Dooley, wrote to SCNO's president, requesting permission for the Union's organizers to board the Company's boats. SCNO's lawyer, Milton Talent, responded to Dooley's letter on August 9, informing Dooley that the Company would not permit union organizers to board its boats. Talent wrote that granting the Union access would "interfere substantially with Company production and operations." Talent further stated that the Company intended to see that the employees' rights under the NLRA were fully implemented and that "[a]ny reasonable, realistic and practical suggestions [from the Union] as to how that may be carried out will be seriously considered." On August 23, 1979, the Union filed an unfair labor practice charge against SCNO, based on its refusal to give the Union access to the Company's boats.

On August 30, 1979, Dooley wrote to SCNO, requesting a list of the names and addresses of employees on the boats. Talent responded on September 10, informing the union organizer that the Company would supply such a list, and, about ten days later, Dooley received a list of the names and addresses of SCNO's non-supervisory crew members.

During the following two months, the Union sent three mailings to these employees. In the mailings, the Union enclosed a pamphlet which discussed the Union, along with a detachable pledge card. So far as the record shows, the Union received no response from any of these mailings. Other than the mailings, the Union's organizing efforts were limited to asking riverboat workers who already belonged to the Union to promote the Union and to pass along Union literature when they came into contact with non-unionized crews. The Union made no effort to contact SCNO's employees by telephoning or visiting them at home.

On December 5, 1979, the Regional Director for Region 14 of the Board issued an amended complaint,[1] based on the Union's

---

1. The Regional Director issued the original complaint on November 9, 1979 against SCNO Barge Lines, Inc. and against another towing company, G.W. Gladders Towing Company. The Regional Director issued the amended complaint

charge that the Company had committed an unfair labor practice by denying the Union's organizers access to its boats. An administrative law judge ("ALJ") heard the case on December 19, 1979. At the hearing, John Guay, one of the Union's organizers, testified that the Union did not attempt to visit the employees at their homes after it received the address list because their homes were widely scattered. At one point during the hearing, counsel for the Board's General Counsel, who argued the Union's case at the hearing, asked Guay: "Has there been any occasion recently in which you have tried to contact employees, personally, using a list of names and addresses?" Guay answered in the affirmative, stating that there had been such an earlier occasion in which an employer had provided the Union with a list of the names and addresses of its employees after a representation election had been ordered. Before Guay could testify about the results of the Union's efforts to contact the employees on that occasion, counsel for SCNO objected on the grounds that evidence of the Union's efforts in this earlier situation was irrelevant to the case against his client. The ALJ sustained the objection. The counsel for the General Counsel explained that, through his question, he was trying to demonstrate that the Union in this case decided not to try personally to contact the widely dispersed towboat employees because the organizers knew from past experience that such attempts would be fruitless. The ALJ adhered to his ruling excluding the evidence.

In a decision dated April 14, 1981, the ALJ concluded that SCNO violated § 8(a)(1) of the National Labor Relations Act by refusing to allow union organizers aboard its towboats. He concluded, based on Board precedent, that writing to, telephoning or visiting the widely dispersed homes of employees were not reasonable alternatives to reaching the employees by boarding the boats. SCNO filed numerous exceptions to the ALJ's decision. Neither the General Counsel nor the Union filed exceptions.

On December 15, 1987, the Board issued its decision and order, which disagreed with the ALJ and dismissed the complaint on the ground that SCNO had not violated § 8(a)(1) of the Act by denying the Union's organizers access to its boats. In an opinion signed by two of the three members of the Board's panel, the Board held that while the property right of the Company to keep organizers off its boats and the rights of the workers to have access to information about union organizing were relatively equal, "the General Counsel failed to show that no reasonable means of communicating the Union's organizational message to employees, other than through ship access, existed." *SCNO Barge Lines, Inc.*, 287 N.L.R.B. No. 29, at 1, 127 L.R.R.M. (BNA) 1081, 1081 (Dec. 15, 1987). The Board gave several reasons for its conclusion. First, "although [SCNO] denied the Union's request to permit organizers access to its boats, it invited the Union to make other practical suggestions for implementing the employees' right to receive information about organizing." *Id.* at 2, 127 L.R.R.M. at 1081. Second, "the Union simply did not make sufficient efforts with the means at hand to show that those means were unworkable. It made no attempt to visit the employees at their homes or to obtain the employees' home telephone numbers." *Id.* Finally, it appears that the Board reached its decision in reliance upon the fact that SCNO provided the Union with a list of the nonsupervisory employees' names and addresses.[2]

The Board found the testimony of union organizer Guay inadequate to establish that home visits or telephone calls were unreasonable alternatives to onboard access. *Id.* at 10 n. 22, 127 L.R.R.M. at 1084 n. 22. The Board's majority suggested

against SCNO after both companies moved for severance of the cases against them.

**2.** In the companion case decided the same day as *SCNO Barge Lines*, the Board held that a towboat company did violate § 8(a)(1) when it

not only denied organizers access to its boats but denied the union a list of its employees as well. *G.W. Gladders Towing Co.*, 287 N.L.R.B. No. 30, 127 L.R.R.M. (BNA) 1088 (Dec. 15, 1987).

that the Union's organizers could have telephoned or visited the homes of the employees, or even could have invited the employees "to attend a meeting at the Union's office or other central location." *Id.* at 9–10, 127 L.R.R.M. at 1084.

Board member Wilford Johansen dissented from the majority's opinion. In Johansen's view, the General Counsel had succeeded in proving that the Union had no reasonable means of communicating its organizational message to the crew members. *Id.* at 23, 127 L.R.R.M. at 1088 (Johansen, Member, dissenting).

## DISCUSSION

### A. *Initial Points*

As stated, one principal reason assigned by the Board to justify its decision that there was no violation of § 8(a)(1) was that, although SCNO denied the Union's organizers access to its boats, it "invited the Union to make other practical suggestions for implementing the employees' right to receive information about organizing." *Id.* at 2, 127 L.R.R.M. at 1081. We believe this invitation by the Company should have had scant bearing on the Board's decision. Whatever other arrangements the Union might have suggested and whether the Company would have agreed to implement such arrangements is entirely speculative. As it stands, the invitation by SCNO for suggestions was merely a gesture towards cooperation. While such a gesture might be commendable, it hardly has real relevance to the question of whether the Company committed an unfair labor practice.

▇ A second reason assigned by the Board for its conclusion that the General Counsel failed to prove there were no reasonable alternative means of communication under the circumstances of this case was that the Union "did not make sufficient efforts with the means at hand to show that those means were unworkable." *Id.* at 2, 127 L.R.R.M. at 1081. In *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112,

76 S.Ct. 679, 684, 100 L.Ed. 975 (1956), the Supreme Court held that union organizers have no right to enter onto an employer's property "if reasonable efforts by the union through other available channels of communications will enable it to reach the employees with its message." In *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 205, 98 S.Ct. 1745, 1761, 56 L.Ed.2d 209 (1978), the Court made clear that the union had the burden of proving that alternative means of communication were not reasonable. However, the Supreme Court has not held that to fulfill its burden of proving that no reasonable alternative means of communication exist, a union must attempt to communicate with employees through means it considers unreasonable. Indeed, it would be wasteful to require a union to expend its resources of time and money attempting to contact employees by various means simply to enable the union to demonstrate that the means of communication available to it are inadequate. If experience has shown that a particular channel of communication is unreasonable, the union should be permitted to present evidence of the results of such past efforts which demonstrate that fact. Therefore, we join the Fifth and Tenth Circuits in rejecting the rule that a union must try a particular means of communication in order to prove that such means is unreasonable. *See Husky Oil, N.P.R. Operations, Inc. v. NLRB*, 669 F.2d 643, 645 (10th Cir.1982) (such a rule "creates delay and additional expense for the union whenever those alternatives are unsatisfactory—it forces the union to undertake futile efforts in order to secure a favorable Board determination"); *Belcher Towing Co. v. NLRB*, 614 F.2d 88, 91 (5th Cir.1980) (*Sears, Roebuck* and *Babcock & Wilcox* "require only a showing that such attempts would be unsuccessful under the circumstances; a union need not have actually attempted to communicate with the employees").[3]

---

**3.** In *Belcher Towing Co.,* 614 F.2d 88, the Fifth Circuit misconstrued this court's holding in *NLRB v. New Pines, Inc.,* 468 F.2d 427 (2d Cir. 1972). According to the Fifth Circuit, we held

in *New Pines* that "in order to sustain its burden of proving lack of alternative means, a union must demonstrate that it unsuccessfully attempted to utilize other means." *Belcher Tow-*

### B. *Use of the List of Employees*

Thus, unpersuaded by two of the justifications given by the Board for its conclusion that no unfair labor practice occurred, we now examine the remaining stated reason: that the Company gave the Union a list of the names and addresses of its non-supervisory employees. By furnishing this list, the Company therefore gave the union organizers several options to pursue in attempting to convey their message: (1) the organizers could and did attempt to solicit the employees by mail; (2) they could have tried to solicit the employees by telephone; (3) they could have attempted to arrange meetings with employees at a Union office or at some other place; and (4) they could have attempted to arrange visits with the employees at their homes. Whether such means of communication are reasonable in a given situation, in light of *Babcock & Wilcox* and *Sears, Roebuck*, is a mixed question of fact and law. Courts, in seeking to answer such questions, often defer to the judgment of the administrative agency. Deference to the judgment of the agency, however, is not always warranted. *See Hi–Craft Clothing Co. v. NLRB*, 660 F.2d 910, 913–14 (3d Cir.1981); *Pittston Stevedoring Corp. v. Dellaventura*, 544 F.2d 35, 49 (2d Cir.1976) (Friendly, J.) (when faced with a mixed question of law and fact, a court of appeals must decide whether or not to defer to the agency's decision), *aff'd sub nom. Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). We believe that this case is one in which deference to the agency is not warranted.

Courts are less inclined to show deference for the judgment of an administrative agency when the deciding members of the agency itself hold differing opinions on the matter in question, *see Barrett Line, Inc. v. United States*, 326 U.S. 179, 197, 65 S.Ct. 1504, 1512, 89 L.Ed. 2128 (1945), and,

even more importantly, when the agency's decision is inconsistent with the general direction of its past decisions, *see NLRB v. Yeshiva Univ.*, 444 U.S. 672, 687, 100 S.Ct. 856, 865, 63 L.Ed.2d 115 (1980); *Barrett Line*, 326 U.S. at 192–93, 196–97, 65 S.Ct. at 1510–11, 1512; *NLRB v. St. Mary's Home, Inc.*, 690 F.2d 1062, 1067 (4th Cir. 1982). Here, the Board's three-member panel split, with Member Johansen dissenting. Moreover, the Board's decision herein marked a departure from the direction of its earlier decisions in which the Board held that union organizers should be allowed on board vessels when no other ready means of access to the crews exist. *See Belcher Towing Co.*, 256 N.L.R.B. 666 (1981) (employer violates § 8(a)(1) by denying union organizers access to its tugboats and barges, when, *inter alia*, homes of crew members were widely dispersed and crew spent long periods on board vessels), *enf. denied without opinion*, 683 F.2d 418 (11th Cir.1982); *Ingram Barge Co.*, 204 N.L.R.B. 63 (1973) (no violation of § 8(a)(1) for employer to refuse union organizers access to its boats where union's request for access was untimely; normally, however, union should be granted access); *Sioux City & New Orleans Barge Lines*, 193 N.L.R.B. 382 (1971) (alternative means of communication with crew members of employer's towboats inadequate when crew members' homes were scattered over fifteen states), *enf. denied*, 472 F.2d 753 (8th Cir.1973); *Interlake Steamship Co.*, 174 N.L.R.B. 308, 309 (1969) (alternative means of communication with employer's crew members inadequate when, *inter alia*, employees' homes were scattered over a "huge geographical area"), *aff'd*, 178 N.L. R.B. 128 (1969). In light of these decisions regarding access, we believe we should not defer to the judgment of the Board herein in determining whether the name and ad-

---

*ing,* 614 F.2d at 90. This is a misinterpretation of this court's holding. In *New Pines,* this court wrote that "one of the crucial questions in access cases is whether a union, before insisting that an employer 'aid organization,' has itself made *'reasonable'* attempts to communicate with the employees it seeks to organize." 468 F.2d at 429 (emphasis added). By this the court

meant that when reasonable alternative means of communication do exist—as they clearly did in *New Pines*—a union must pursue them. We do not understand that the court meant that when the alternative means that exist are unreasonable, the union must make efforts to use those means simply to prove their inadequacy.

dress list provided the Union with reasonable means of access to the Company's employees. Therefore, we now proceed to analyze and to determine independently the reasonableness of each channel through which the Union could have contacted the employees using the name and address list.

### 1. *Mailings*

■ The only use the Union made of the name and address list furnished by SCNO was to send mailings to the employees, enclosing a pamphlet and pledge card. In its decision, the Board did not explicitly state that mailings alone provided a reasonable alternative to boarding the boats. The Board stated that the Union, in failing to prove that alternative channels of communication were unworkable, did not "demonstrate that the mailings it sent were not received.... It merely showed that no one responded." 287 N.L.R.B. No. 29, at 2, 127 L.R.R.M. at 1081. By pointing out that the Union failed to demonstrate that the mailings were not received, the Board implied that mailings may have been a reasonable means of communication unless something prevented the mailings from reaching the employees, and thus might have rendered this an unreasonable means of communication.

We reject this implication. In *NLRB v. S & H Grossinger's Inc.*, 372 F.2d 26, 29 (2d Cir.1967) (quoting *NLRB v. United Aircraft Corp.*, 324 F.2d 128, 130 (2d Cir.1963), *cert. denied*, 376 U.S. 951, 84 S.Ct. 969, 11 L.Ed.2d 971 (1964)), this court wrote that "[m]ailed material would be typically lost in the daily flood of printed matter which passes with little impact from mailbox to wastebasket." The Third Circuit, in *NLRB v. Tamiment, Inc.*, 451 F.2d 794, 798 (3d Cir.1971), *cert. denied*, 409 U.S. 1012, 93 S.Ct. 440, 34 L.Ed.2d 306 (1972), concluded that "mail is no substitute for face to face contact." The Board itself has reached this conclusion more than once. *See Sioux City*, 193 N.L.R.B. at 386; *Interlake Steamship Co.*, 174 N.L.R.B. at 309. From these cases it seems clear that use of the mail alone, without a realistic opportunity for face-to-face contact, is not a reasonable

means of communicating a union's message.

### 2. *Telephone Solicitation*

■ According to the Board, the Union failed to prove that telephoning the employees was an unreasonable alternative. 287 N.L.R.B. No. 29, at 10–11, 127 L.R.R.M. at 1084–85. In our view, telephone solicitation herein was not a reasonable alternative means of communication. In *Belcher Towing Co.*, 256 N.L.R.B. at 667, the Board wrote that "[d]irect personal contact is the most truly effective means of communicating ... the option of collective bargaining...." In *Joseph Bancroft & Sons, Co.*, 140 N.L.R.B. 1288, 1291 (1963), the Board held that the possibility that the union might have reached employees by telephone or other alternative means was not "a feasible substitute for personal solicitation." In *Sioux City*, 193 N.L.R.B. at 382, a case involving the same employer, SCNO, and a nearly identical situation in which crew members resided in widely dispersed homes, the Board concluded that the alternative means of communication available to the union, telephone calls included, were not reasonable. *Id.* at 386–87. Based on the principle established by the Board in these cases—that telephone solicitation is not comparable to face-to-face contact as an organizing method—we conclude that telephone solicitation in this case, without a realistic opportunity for face-to-face contact, was not a reasonable alternative to allowing the union organizers to board the employer's boats.

On appeal, both the Board and the Company point out that in *Babcock & Wilcox*, 351 U.S. at 107 n. 1, 113, 76 S.Ct. at 1020 n. 1, 1023, the Supreme Court identified solicitation through the mail and over the telephone as among "[t]he usual methods" unions use to impart information to employees. However, the Court did not state that these methods, without more, provided an adequate means of communication. We note that in *Babcock*, approximately forty percent of the employees lived in one town and the rest lived within thirty miles of the town. *Id.* at 106, 76 S.Ct. at 1019. Union organizers met employees on the streets

and drove to their homes. *Id.* at 107 n. 1, 76 S.Ct. at 1020 n. 1. It seems clear that, supplemented by face-to-face contact, mailings and calls may well constitute part of an effective organization campaign. In the instant case, however, the Union did not have relatively easy access to employees as the union had in *Babcock.* We believe that without a realistic opportunity for face-to-face contact, mailings and telephone calls are inadequate.

### 3. *Invitations to Meetings*

The Board also suggested that the Union could have invited "crewmen ... to attend a meeting at the Union's office or other central location." 287 N.L.R.B. No. 29, at 9–10, 127 L.R.R.M. at 1084. In earlier cases, the Board has rejected the idea that a union can rely on workers to take the initiative in an organizing drive. In *Interlake Steamship Co.,* 174 N.L.R.B. at 309, the Board wrote that although, *inter alia,* "employees while on shore leave might voluntarily have visited the [union's] meeting halls," the union nonetheless lacked an adequate means of communicating its message. In *Joseph Bancroft,* 140 N.L.R.B. at 1291, the Board wrote that "[h]ere an organizational campaign could not be carried on effectively without the 'seeking out' of employees." In our view, it was unrealistic of the Board to expect employees herein to go out of their way to meet with union organizers, at least before those organizers have had a chance to inform the employees in person about the claimed benefits of organizing.

### 4. *Home Visits*

■ As the Board noted in its decision, the Union might have used the employee list to arrange home visits with the employees. We believe that home visits were a means of communication which may have offered the Union a reasonable alternative to boarding the boats. We are aware that in *Sioux City,* 193 N.L.R.B. at 386–87, a case nearly identical to this one, the Board held that home visits were not a reasonable alternative means of communication. In that case, however, the union obtained the list of the employees' addresses from the

employer on September 25, 1979 and the representation election was held shortly thereafter in late October. *Id.* at 382, 384. At most, the union had little more than a month to visit employees at home. In all likelihood, it was the union's lack of sufficient time to visit employees before the imminent election which led the Board to conclude in *Sioux City* that home visits were unreasonable. Herein, by contrast, as far as we are aware there was no particular time limit on the Union's organizing efforts. Arguably, if a union has enough time to visit the employees in their homes, home visits might be a reasonable alternative even though the homes are widely dispersed. Our present view is that we cannot conclude simply on the basis of the ruling in *Sioux City* alone that home visits were unreasonable.

Of course, time is not the only factor in determining whether a particular means of communication is reasonable. Cost is yet another factor. See *S & H Grossinger's,* 372 F.2d at 29 (radio and newspaper advertising not reasonable alternatives since they are "*expensive* and relatively ineffectual") (emphasis added); *United Aircraft,* 324 F.2d at 130 ("alternatives [to solicitation on the employer's property] bear without exception the flaws of greater *expense* and effort") (emphasis added). In this case, although the Union apparently had unlimited time, we have no way of knowing whether the cost of sending organizers into twelve states to locate and visit the homes of the far-flung employees was prohibitive. As the Board pointed out, in the record "there is no evidence concerning the costs" of home visits. 287 N.L.R.B. No. 29, at 11, 127 L.R.R.M. at 1085. Without such evidence, we cannot conclude that home visits were unreasonably costly.

There are other cases in which the Board held that visits to crew members' homes were not a reasonable alternative to on-board access but they are easily distinguishable from the present case. In these cases, *Belcher Towing,* 256 N.L.R.B. 666, and *Interlake Steamship,* 174 N.L.R.B. 308, the employer did not give the union a list of the employees' names and addresses.

None of the Board's prior decisions holding home visits to be unreasonable compel a similar conclusion here. Thus, we are constrained to agree with the Board that the record herein is inadequate to establish that home visits were unreasonable. 287 N.L.R.B. No. 29, at 10 n. 22, 127 L.R.R.M. at 1084, n. 22. The Union had the burden of proving that alternative means of communication were unreasonable, *Sears, Roebuck*, 436 U.S. at 205, 98 S.Ct. at 1761. It failed to meet this burden; consequently, we are constrained to deny the petition.

C. *The Evidentiary Issue*

■ The Union argues that we should remand this case to the Board to allow it to consider evidence, excluded by the ALJ, regarding the Union's efforts in a prior campaign to contact widely dispersed employees. While this evidence may have been relevant, especially if it revealed the cost to the Union of making home visits, the failure of the Union or the General Counsel to file an exception to the ALJ's ruling excluding the evidence prevents us from considering the issue on appeal.

According to 29 C.F.R. § 102.46(h) (1988), "[n]o matter not included in exceptions or cross-exceptions may thereafter be argued before the Board, or in any further proceeding." No exception to the ALJ's ruling was filed by the Union or the General Counsel; therefore, the Union may not be heard to argue on appeal that the ALJ's ruling was erroneous. *See NLRB v. L & B Cooling, Inc.*, 757 F.2d 236, 240 (10th Cir. 1985) ("[A]ny contentions advanced before the ALJ which are not preserved for review in exceptions or cross-exceptions are deemed waived in the absence of extraordinary circumstances.").

**4.** The Board probably erred in its conclusion that the offer of proof was inadequate. Under Fed.R.Evid. 103(a)(2), error may be predicated upon a ruling excluding evidence so long as, in the offer of proof, "the substance of the evidence was made known to the court." At the hearing, after the ALJ excluded the evidence, the counsel for the General Counsel said:

Your Honor, without burdening the record with a question-and-answer offer of proof, I would offer to prove that in this situation

In its opinion, the Board in a footnote alluded to the ALJ's ruling excluding the evidence. 287 N.L.R.B. No. 29, at 10 n. 22, 127 L.R.R.M. at 1084 n. 22. The Board did not mention the ALJ's ruling directly but wrote that the offer of proof made by the General Counsel, to preserve his objection to the ALJ's ruling for later consideration by the Board, was "merely conclusory, as [it] failed to set forth any specific facts concerning what efforts the Union made to reach the employees." *Id.*[4]

■ The Board's indirect reference to this evidentiary issue does not preserve the issue for appeal. Discussion of an issue by the Board does not save the issue for appeal when the issue was not raised before the Board. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665–66, 102 S.Ct. 2071, 2082–83, 72 L.Ed.2d 398 (1982); *Local 900, Int'l Union of Elec., Radio and Machine Workers v. NLRB*, 727 F.2d 1184, 1191 (D.C.Cir.1984). Here, the Board did not even discuss whether the ALJ's ruling was correct, but merely discussed the inadequacy of the offer of proof which followed the ruling. We conclude that the correctness of the ALJ's evidentiary ruling is an issue not properly before us.

## CONCLUSION

As it stands, the record contains insufficient evidence to support a conclusion that home visits herein were an unreasonable alternative means of communication. The failure of the Union and the General Counsel to file an exception bars us from considering whether the ALJ should have allowed a union organizer to testify about the results of the Union's efforts in an earlier campaign to contact widely dispersed em-

where they had the Excelsior list, their attempts to make face-to-face contact with these employees, even having their mailing addresses, was fruitless.

By this statement, counsel made known to the ALJ the substance of the evidence he wanted to introduce. Therefore, his offer of proof appears to have been adequate. However, the Board was precluded from considering the issue nonetheless since the General Counsel failed to file an exception to the ALJ's ruling.

ployees. For the reasons discussed, the petition is denied.